**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DONNIE LUCKY CANTRELL,<br><br>        Plaintiff,<br><br>    v.<br><br>S. TYSON,<br><br>        Defendant. | No. 2:19-CV-1192-TLN-DMC-P<br><br><u>FINDINGS AND RECOMMENDATIONS</u> |

Plaintiff, a prisoner proceeding pro se, brings this civil rights action under 42 U.S.C. § 1983. Pending before the Court are Defendants' motion for summary judgement, ECF No. 35, Plaintiff's opposition, ECF No. 39, and Defendants' reply, ECF No. 40.

## I. PLAINTIFF'S ALLEGATIONS

Plaintiff, currently an inmate at California Men's Colony (CMC) brings suit against S. Tyson, a correctional officer at the Sierra Conservation Center (SCC),. ECF No. 1, pgs. 2; 4-6. Plaintiff does not name a location where the events giving rise to the complaint took place, but the allegations suggest the location was SCC. ECF No. 35-2, pg. 2. Plaintiff claims Defendant Tyson violated Plaintiff's "Eighth Amendment right to be free from cruel and unusual punishment in the form of deprivation of personal safety." ECF No. 1, pg. 3.

///

1

Tyson allegedly denied Plaintiff breakfast for not having his identification card (ID) with him. Id. Plaintiff claims that after he went back to his dorm, "Tyson and several other officers commanded all of the inmates… to strip down to our underwear for a bodily inspection." Id. During the search, Tyson allegedly yelled, "You can all thank Mr. Cantrell for what is about to happen!" Id. at 4. Plaintiff claims that when the inmates returned to their dorm, the inmates' personal property had been scattered, trashed, and misplaced. See id. Plaintiff claims he felt that "the tension between myself and the rest of the inmates was building into potential violence." Id. When another correctional officer moved Plaintiff to his previous accommodations, that officer allegedly told Plaintiff that Plaintiff was "not welcome on that Yard anymore." Id. On September 18, 2018, Plaintiff claims gangs from A Yard threatened violence if Plaintiff did not pay for the destroyed property. Id. Plaintiff claims he filed a 602 for safety concerns that resulted in an escort to "Ad Seg" on October 30, 2018, where Plaintiff alleges that he sat for months. Id. Plaintiff alleges that Tyson's actions caused Plaintiff psychological and emotional distress. Id. at 6.

## II. THE PARTIES' EVIDENCE

### A. **Defendant's Evidence**

Defendant's motion for summary judgment is supported by the declarations of S. Tyson (ECF No. 35-6); T. Presson, at the time of the events a Correctional Lieutenant employed by the California Department of Corrections and Rehabilitation (ECF No. 35-5); and Van Kamberian, a Deputy Attorney General employed by the Office of the Attorney General for the State of California and Defendant's previous counsel (ECF No. 35-4). Defendant also submitted a Statement of Undisputed Facts, ECF No. 35-3, contending the following facts are undisputed:

> 1. Plaintiff Donnie Cantrell was an inmate incarcerated by the California Department of Corrections and Rehabilitation (CDCR), and was housed at the Sierra Conservation Center (SCC) in September 2018, the time frame of the alleged incidents. (Compl. at 2-3, ECF No. 1.)
>
> 2. Plaintiff brings this action under 42 U.S.C. § 1983, alleging that Defendant Tyson was deliberately indifferent to a serious risk to Plaintiff's safety, in violation of the Eighth Amendment. (Compl. at 3; Order at 3, ECF No. 7.)

///

3.  Defendant Tyson was employed by CDCR as a correctional officer at SCC at the time the events are alleged to have occurred. (Compl. at 2-3.)

4.  Plaintiff claims that on September 17, 2018, Defendant Tyson denied him entry to the cafeteria during breakfast because Plaintiff did not have his identification card with him, despite Plaintiff's telling Tyson that his identification card had been taken by staff and he had yet to be issued a new card. (Compl. at 3; Cantrell Dep. 20:12-25, 23:3-9; 25:6-24.)

5.  Plaintiff further claims that at approximately 9:00 a.m. on September 17, 2018, immediately before his housing dorm was searched by Defendant Tyson and several other officers, Defendant Tyson announced to the inmates, "This is what happens when an inmate doesn't carry his ID with him. You can all thank Mr. Cantrell for what is about to happen." (Compl. at 3-4; Cantrell Dep. 31:20-32:20-17.)

6.  Plaintiff alleges that after the search, the inmates returned to find the dorm in disarray, with the inmates' property mixed up, scattered into different rooms, and broken, and that the other inmates blamed Plaintiff because defendant Tyson told them Plaintiff was the reason for the search. (Compl. at 4, Cantrell Dep. 41:2-42:6, 55:6-56:4)

7.  Plaintiff claims that he was transferred to a different yard within an hour of the search, but the next day, inmates began demanding that Plaintiff pay for the damaged property, and other inmates told Plaintiff to pay. (Compl. at 4, Cantrell Dep. 48:23-49:6, 50:2-20; 59:19-60:23; 66:9-67:7.)

8.  Plaintiff submitted an inmate grievance because he felt that the situation could escalate and result in serious consequences, and that he needed to get away or his safety would be in danger. (Cantrel Dep. 67:3-7, 68:5-14.)

9.  Plaintiff was never physically attacked or harmed as a result of his allegations. (Cantrell Dep. 74:21-24.)

10. Plaintiff never received an actual threat of violence against him and cannot identify any inmate who he claims threatened him, sent him an ultimatum, or was furious with him after the search. (Pl.'s Verified Responses to Interrogatories Nos. 9, 11, 13, 16; Cantrell Dep. 55:22- 24, 56:18-19, 57-:24-58:4, 60:18-20, 61:4-11, 63:4-18, 64:2-14, 65:15-66:8, 66:16-67:7, 68:5-14; Toubeaux Decl. Ex. A.)

11. Before September 17, 2018, Defendant Tyson had never met or spoken with Plaintiff, never had any negative interactions or disagreements with Plaintiff, and never wrote Plaintiff up for any disciplinary issues or rules violations; and she has never harbored any ill will against Plaintiff. (Tyson Decl. ¶ 4, 8; Cantrell Dep. 13:23-14:9.)

ECF No. 35-3.

///

Defendant's Statement of Undisputed Facts largely relies on the allegations in the complaint. However, the Defendant's Statement of Undisputed Facts do not specifically address a central issue – whether Defendant Tyson made the statement: "You can all thank Mr. Cantrell for what is about to happen!" Tyson's declaration, filed in support of her motion for summary judgment does, however, addresses this issue. See ECF No. 25-6. Specifically, Defendant Tyson states in her declaration that she never made this statement. See id. at 2. Defendant does not discuss or even cite this evidence in her Statement of Undisputed Facts.

### B. Plaintiff's Evidence

When bringing a motion for summary judgment, the moving party must submit a Statement of Undisputed Facts that cites to specific portions of "any pleading, affidavit, deposition… or other document relied upon to establish that fact." E.D. Cal. Local Rule 260(a). Opposing parties have two options in response. Opposing parties must reproduce movant's Statement of Undisputed Facts and deny any fact cited therein with reference to supporting evidence or file a Statement of Disputed Facts that cites to the record with any additional material facts which present a genuine issue. See E.D. Cal. Local Rule 260(b).

In response to Defendant's Statement of Undisputed Facts, Plaintiff filed a Statement of Disputed Facts asserting genuine issues of disputed fact. See ECF No. 39. In support of his opposition, Plaintiff offers his own declaration signed under penalty of perjury, see id. at 9-10, as well as the following exhibits:

| | | |
|---|---|---|
| Exhibit A | | Plaintiff's form CDCR 602 inmate grievance and administrative responses thereto, id. at 12-15. |
| Exhibit B | | Plaintiff's responses to interrogatories, id. at 17-22. |
| Exhibit C | | Plaintiff's form CDCR 602 inmate grievance and administrative responses thereto, id. at 24-26, a copy of the declaration of T. Presson filed in support of Defendant's motion for summary judgment, id. at 27-29, and a CDCR form 128B closure chrono signed by Presson, id. at 30. |
| Exhibit D | | Page 20 of the transcript of Plaintiff's October 14, 2020, deposition, id. at 32. |
| Exhibit E | | A Request for Correspondence Approval form, id. at 34. |

///

Because Plaintiff is pro se, the Court "must consider as evidence in his opposition to summary judgment all of [the] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [Plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004). Therefore, the Court will also consider as evidence the factual assertions made in Plaintiff's complaint, which is verified.

In response to Plaintiff's Opposition, Defendant filed a reply, ECF No. 40. Defendant states:

> In his opposition to Defendant's motion for summary judgment, Plaintiff provides no evidence beyond reiterating his own speculative and generalized fears of being at risk of harm at the hands of other prisoners. Nor does he make a showing of a clear consensus of case law putting beyond debate whether a statement such as Defendant is alleged to have made is so inherently dangerous that every reasonable officer would know that it would expose Plaintiff to violence from other inmates, and thus violate his constitutional rights. Instead, in conclusory statements unsupported by evidence, Plaintiff claims that there is no doubt Defendant knew her alleged statement could put Plaintiff's safety at risk.

ECF No. 40, pg. 1. Defendant asserts that all of Plaintiff's cited evidence "fails to identify any portion of his deposition, the complaint, his original inmate grievance, or any discovery in this case that contains evidence of any instance in which he was actually threatened with violence or was informed violence would be used against him." Id. at 2. Any testimony from T. Lewis would purportedly not show any evidence that any "specific threat of violence or harm" was made against Plaintiff. Id. at 3.

Additionally, Defendant proposes that the Court strike Plaintiff's affidavit wherein Plaintiff claims he received threats on his life or any threats of violence:

> The Court should disregard Plaintiff's belated assertion that he began receiving threats on his life on September 18, 2018, because it creates a sham issue of fact that contradicts Plaintiff's deposition testimony. *See Yeager v. Bowlin* 630 F.3d 1076, 1081 (9th Cir. 2012). *See also Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."). The "sham affidavit rule prevents 'a party who has been examined at length on deposition from raising an issue of fact simply by submitting an

5

> affidavit contradiction his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991.) A contradiction is a sham where the "inconsistency between a party's deposition testimony and subsequent affidavit" is clear and unambiguous. *Van Asdale*, 577 F.d [sic] at 998-999. In such a situation a court can strike the sham portion of the affidavit. *Id.*
>   Here Plaintiff was repeatedly asked about messages he received and communications from other inmates. Indeed, Plaintiff provided an in-depth recitation of the events of September 18 and 19, 2018, lasting several pages of his deposition, and at no point did he testify that he received a threat on his life. (Cantrell Dep., 57:24-58:4, 60:18-20, 61:4-11, 63:4-18, 64:2-14, 65:15-67:7.) Instead, Plaintiff described being told to pay, that other inmates wanted their money, or that other inmates wanted to talk to him. (Id.) At no point in his testimony does he describe a threat on his life or any actual threat of violence. (Id.) What he describes is his own speculation based on the purported requests by inmates that he pay. (Id.) Accordingly, because his declaration asserting he received threats on his life on September 18, 2018, is a direct and unambiguous contradiction of his deposition testimony, the Court should strike this inconsistent assertion as a sham.

Id. at 3-4.

### III.  STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

/ / /

/ / /

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could

properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

### IV. DISCUSSION

In his complaint, Plaintiff's claims that Defendant Tyson put Plaintiff's safety at risk after a dorm search when she said, "You can all thank Mr. Cantrell for what is about to happen." ECF No. 1, pg. 4. He contends that, in making that comment, Defendant violated the Eighth Amendment. In her motion for summary judgment, Defendant argues: (1) Plaintiff cannot show that the statement attributed to Tyson demonstrates a subjective knowledge of an objective risk of harm to Plaintiff; (2) even if it did, Plaintiff cannot demonstrate that he was assaulted or threatened by other inmates as a result of the alleged comment; and (3) Defendant is entitled to qualified immunity.

#### A. Risk to Plaintiff's Safety

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

///

Under these principles, prison officials have a duty to take reasonable steps to protect inmates from physical abuse. See Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir. 1982); Farmer, 511 U.S. at 833. Liability exists only when two requirements are met: (1) objectively, the prisoner was incarcerated under conditions presenting a substantial risk of serious harm; and (2) subjectively, prison officials knew of and disregarded the risk. See Farmer, 511 U.S. at 837. The very obviousness of the risk may suffice to establish the knowledge element. See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995). The knowledge element does not require that the plaintiff prove that prison officials know for a certainty that the inmate's safety is in danger, but it requires proof of more than a mere suspicion of danger. See Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986). Finally, the plaintiff must show that prison officials disregarded a risk. Thus, where prison officials actually knew of a substantial risk, they are not liable if they took reasonable steps to respond to the risk, even if harm ultimately was not averted. See Farmer, 511 U.S. at 844.

Defendant asserts that Plaintiff cannot show Tyson subjectively knew or was aware of the risk such a statement made to Plaintiff's safety. ECF No. 35-2, pgs. 4-5. Tyson relies on "snitch" as a baseline of possible and associated language officers might use that are likely to result in harm or a risk of harm to Plaintiff's safety. Id. at 5. Tyson argues that the comment Plaintiff attributes to her does not show she was subjectively aware of a risk to Plaintiff's safety and does not amount to the same likelihood of violence that might result from labeling Plaintiff a "snitch." Id. at 5-7; 13.

Defendant further contends that "even if Defendant had intended to put Plaintiff at risk of harm," Plaintiff must still show "he has been assaulted or threatened with an assault by other prisoners." Id. at 8. Defendant argues Plaintiff cannot do so.  Defendant cites to Cantrell's deposition, wherein Plaintiff testifies to "only his generalized fear and speculation of future harm." Id. at 9.  In particular, Defendant points to Plaintiff's deposition testimony:

> A:   And the blacks are now talking to me saying, okay well, man, just pay them because we're not trying to mess our days up because of a situation like this, because of something that you did. And so now I'm starting to feel pressure from my own race where they're not even hearing me out that I'm not at fault. And – but I still maintain that I – you know, I

9

> don't owe anybody anything. But I'm starting to feel the pressure from all sides, from the Mexicans and the blacks, because the blacks don't want to have a racial riot over little ol' me because of something I did. And, however the Mexican politics operate, they have shot calls and stuff like that. So whoever doesn't talk and they feel like a decision needs to be made, they'll make that decision in the end. I don't know too much about politics, but I been in enough incidents where I know this could end up being serious.
>
> * * *
>
> A:  So now there's guys at the gate calling for me and, you know, asking me when am I gonna pay and all this. So I'm like – then they really – this is really becoming serious. So I got to the point where I felt that I needed to get away or else, you know my safety is in danger. I didn't want to do nothing to anyone and I didn't want anything done to me. So I felt that the smartest and the safest thing to do would be to write the administration on a 602 and tell them that my life is in danger.

ECF No. 35-3 (Statement of Undisputed Facts, ¶ 10, citing Cantrell Dep. 66:16-67:7 and 68:5-14).

In his opposition, Plaintiff asserts that Defendant Tyson was aware that "her misconduct exposed [Plaintiff] to a substantial risk of serious harm" because her statement "You all can thank Mr. Cantrell for what is about to happen" singled Plaintiff out as the source of the inmates' punishment. See ECF 39, pg. 4. Plaintiff cites to Defendant's "snitch" argument in the motion as support that Tyson's statement was enough to result in serious and dangerous consequences to an inmate. Id. at 4, 6; see ECF No. 35-2, pg. 5. Plaintiff denies Defendant's assertion that Tyson never negatively interacted with Plaintiff and that Tyson has no negative intentions towards Plaintiff because of Tyson's comment. Id. at 4. Plaintiff relies on his interaction with Tyson at the cafeteria and dorm search as evidence of negative interactions and intentions. Id. Plaintiff claims Tyson "knew that her words would be remembered once the inmates saw the damage left behind." Id. Plaintiff suggests that when the inmates saw the damage "they all blamed [Plaintiff] because the Defendant instructed them to" is proof that Defendant intended to put Plaintiff in danger. Id. at 6. Plaintiff claims he has a witness, an inmate by the name of T. Lewis, who saw the dorm search and will testify for Plaintiff. Id. at 8. However, Plaintiff has been unable to communicate with Lewis since Lewis has been paroled. Id.

///

///

As a result of the destroyed or missing property from the dorm search, Plaintiff alleges "Defendant not only incited violence but she encouraged violence as well." Id. at 6. Plaintiff does not indicate, aside from threats and multiple alleged approaches for reimbursement from unidentified "Hispanics" on B Yard, what violence Defendant incited or caused to occur because of the search or present evidence of any injuries that resulted from this violence. Id. Plaintiff further asserts T. Presson's declaration falsely alleges that at no point during their interview did Plaintiff say he had been threatened with violence by any inmate or group of inmates. Id. at 6, 8, 28. Plaintiff cites to Exhibit C, which are copies of Plaintiff's grievances, T. Presson's declaration, and a closure chrono from Plaintiff's interview with Presson. See id. at 24-30. Plaintiff underlined a sentence in his second level review where Plaintiff wrote he was threatened with violence if he did not reimburse "the Hispanics" in B Yard. Id. at 26. The closure chrono and Presson's declaration show that Plaintiff communicated his concern about "Southern Hispanics [sic] demanding that he pay for property that was damaged during a search" but does not indicate Plaintiff mentioned violence or potential violence from the same or different groups. Id. at 28, 30. Presson's closure chrono, however, indicates he believed if "Cantrell was rehoused on Facility A or Facility B, his safety would be in jeopardy." Id. at 30.

Defendant contends: (1) the alleged comment made by Tyson does not indicate a subjective knowledge of a risk of harm because it did not label Plaintiff a "snitch"; and (2) even if it does, Plaintiff cannot show he was actually harmed.

1. Whether Plaintiff Must Demonstrate Actual Harm

Defendant contends that, even if she made the alleged statement, Plaintiff must have suffered physical harm. Id. According to Defendant, where an officer shows deliberate indifference because of a label like "snitch," "the inmate must show that he has been assaulted or threatened with an assault by other prisoners." Id. at 6. The Court does not agree. The standard for safety does not require a showing that Plaintiff suffered actual injury as a result of Defendant's conduct. Plaintiff must show that Defendant knew of and disregarded a substantial safety risk. See Farmer, 511 U.S. at 837; see Berg, 794 F.2d at 459.

///

        2.       Whether Tyson's Comment Shows Subjective Knowledge of an Objective Risk to Plaintiff's Safety

Tyson argues that the comment, "You can all thank Mr. Cantrell for what is about to happen," is not a comment a reasonable officer would believe puts an inmate at risk of harm. ECF No. 35-2, pg. 7. According to Defendant, "snitch" is recognized as a label that is likely to put an inmate's safety at risk and likely lead to a finding of deliberate indifference. Id. at 5. Tyson argues that not all comments or labels like Tyson's alleged comment give rise to serious and dangerous consequences for an inmate. See id. at 5-6. Defendant argues:

> There is no evidence that Defendant knew, or that a reasonable officer would know, that such a statement would expose Plaintiff to a substantial risk of harm. The alleged statement does not carry with it the significant and obviously dangerous implications of labeling an inmate as a "snitch" in the prison context. Instead, it is at most similar to the sort of verbal harassment which is generally not a constitutional violation. Even if this announcement constitutes negligent or even grossly negligent behavior on the part of Defendant, it is not sufficient to show deliberate indifference. Instead, the alleged statement is reminiscent of the statement at issue in Morgan, discussed above, in which the Ninth Circuit found there was no basis to for inferring that the defendant was aware that his actions exposed the plaintiff to a substantial risk of serious harm. Morgan, 41 F.3d at 1294. Even if Defendant Tyson's alleged statement could have led to inmates retaliating against Plaintiff, it is not the sort of statement that is so likely to result in serious and dangerous consequences to the inmate that a trier of fact could infer subjective knowledge on the part of Defendant Tyson.

ECF No. 35-2, pg. 7

Tyson attempts to distinguish comments labeling an inmate a "snitch" from her alleged comment by citing to Morgan v. MacDonald, 41 F.3d 1291, 1294 (9th Cir. 1994). In Morgan, an inmate's Eighth Amendment claim was denied because his employer, a prison official running a prison-established program, stating that all of the inmate's coworkers would have to be fired if the inmate's case succeeds was not sufficient to show deliberate indifference. Morgan v. MacDonald, 41 F.3d 1291, 1294 (9th Cir. 1994). The inmate failed to show that the official knew that the comment put the inmate at a substantial risk of harm from retaliation by other inmates. Id. The court reasoned that, unlike labeling an inmate a "snitch," the official's comment did not suggest that the inmate has done something warranting negative attention from other inmates. Id. "Snitching," on the other hand, is highly discouraged in prison populations and one of the labels most likely to lead to physical injury. See Smith v. Ullman, 874 F. Supp. 979, 985 (D.Neb.

1994); Thomas v. District of Columbia, 887 F. Supp. 1, 4 (D.D.C. 1995).

The Court is not persuaded. While Tyson's comment did not use the word "snitch," it nonetheless carried the suggestion that any anger other inmates might have over the loss of their personal property should be directed to Plaintiff. As with labeling an inmate a "snitch," Tyson's alleged comment told other inmates who to blame – Plaintiff. As such, it objectively created a risk of harm. Subjectively, Tyson should have known of the risk of harm associated with the alleged comment. Defendant admits as much with the declaration of T. Presson offered in support of her motion. Presson states: "I believed that, out of an abundance of caution, it would be safest to remove inmate Cantrell from Facility A and B at SCC." ECF No. 35-5, pg. 2. Clearly, Presson believed that, objectively, Defendant Tyson's statement created a risk to Plaintiff's safety. Defendant's own evidence thus defeats her motion and creates a genuine issue of material fact for a jury, specifically whether the statement at issue put Plaintiff in danger.

### B. Qualified Immunity

Defendant argues that she is entitled to qualified immunity. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether the right was clearly established. See id. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (citation omitted). Thus, the final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct

1  violated the alleged right.  See id. at 205.

2  When identifying the right allegedly violated, the court must define the right more
3  narrowly than the constitutional provision guaranteeing the right, but more broadly than the
4  factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667 (9th
5  Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be sufficiently
6  clear that a reasonable official would understand [that] what [the official] is doing violates the
7  right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court
8  concludes that a right was clearly established, an officer is not entitled to qualified immunity
9  because a reasonably competent public official is charged with knowing the law governing his
10 conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff
11 has alleged a violation of a clearly established right, the government official is entitled to
12 qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct
13 did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see
14 also Saucier, 533 U.S. at 205.

15 The first factors in the qualified immunity analysis involve purely legal questions.
16 See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal
17 determination based on a prior factual finding as to the reasonableness of the government
18 official's conduct.  See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court
19 has discretion to determine which of the Saucier factors to analyze first.  See Pearson v. Callahan,
20 555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light
21 most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  See
22 Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

23 Here, Plaintiff alleges a violation of his Eighth Amendment right to safety when
24 Tyson told other inmates Plaintiff should be blamed for loss of their property.  The Court finds
25 this right clearly established.  The Court also finds that there is a dispute of fact as to the
26 reasonableness of Tyson's conduct.  Here, Tyson allegedly made the comment during a dorm
27 search in front of other inmates. ECF No. 35-4, pgs. 14-15. A reasonable officer in Tyson's
28 position would likely know that singling a prisoner out, in a similar fashion to labeling that

prisoner a "snitch," would put that inmate's safety at risk. Without evidence that clearly establishes whether Tyson made the alleged comment, there is a dispute of material fact that prevents a determination of qualified immunity in Tyson's favor on summary judgment. Serrano, 345 F.3d at 1077; see also Martinez, 323 F.3d at 1183-85. Where there are factual disputes as to the parties' conduct or motives, the case cannot be resolved at summary judgment on qualified immunity grounds. See Lolli v. City of Orange, 351 F.3d 410, 421 (9th Cir. 2003); Wilkins v. City of Oakland, 350 F.3d 949, 955-56 (9th Cir. 2003); Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003); Martinez v. Stanford, 323 F.3d 1178, 1183-85 (9th Cir. 2003).

## V. CONCLUSION

Based on the foregoing, the undersigned United States Magistrate Judge recommends that Defendant's motion for summary judgment, ECF No. 35, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 27, 2021

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE